[No. B162753. Second Dist., Div. Two. May 27, 2004.]

ROCKY PANENO, Plaintiff and Appellant, v.
CENTRES FOR ACADEMIC PROGRAMMES ABROAD LTD., Defendant
and Respondent.

## COUNSEL

Carter & Mancini, Thomas P. Carter and Maria A. Mancini for Plaintiff and Appellant.

Stephan, Oringher, Richman & Theodora, Harry W. R. Chamberlain II, Robert M. Dato; Lewis Brisbois Bisgaard & Smith, John R. Feliton, Jr., and Craig L. Dunkin for Defendant and Respondent.

## OPINION

**ASHMANN-GERST, J.**—Plaintiff and appellant Rocky Paneno (Paneno) appeals from the trial court's order granting respondent Centres for Academic Programmes Abroad Ltd. now known as The CAPA Foundation's (CAPA-UK) motion to quash service of summons. We reverse that order. Pursuant to the "representative services" doctrine, as discussed in *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 542–543 [99 Cal.Rptr.2d 824] (*Sonora Diamond*), the Consortium for International Education, Inc. doing business as the Centers for Academic Programs Abroad, Inc. (CAPA-USA) functioned as CAPA-UK's general agent, thereby supporting general jurisdiction over CAPA-UK.

### FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

*The Parties*

Paneno, a college student at Pasadena Community College (PCC),[1] enrolled in a study abroad program through CAPA-USA (the PCC Florence Program). He suffered serious personal injuries in an accident at the apartment house where he resided during his stay in Florence, Italy, and filed this lawsuit against PCC, CAPA-UK, and CAPA-USA.

*Operations of CAPA-UK*

CAPA-UK organizes international educational programs for college students, primarily through contractual associations with colleges and universities throughout the world. According to John J. Christian (Christian), its executive director, CAPA-UK functions much like a tour operator in the organization of the various elements of its programs, including making arrangements with travel suppliers, accommodation suppliers, and other logistical suppliers. None of CAPA-UK's international educational programs takes place in California.

CAPA-UK was first incorporated as a British limited liability company on May 28, 1998, under the name "Centres for Academic Programmes Abroad Ltd." At that time, CAPA-UK's registered address was in London, and CAPA-UK has maintained that registered address as its principal place of business through the present.

---

[1] On April 16, 2004, Paneno filed a stipulation to dismiss part of the appeal, dismissing that portion of the appeal pertaining to PCC.

*Separate Operations of CAPA-USA*

Defendant and respondent CAPA-USA is a California mutual benefit company with its headquarters and principal place of business in Irvine, California. CAPA-USA functions as the United States sales, marketing, and predeparture administration arm for CAPA-UK in the provision of international education programs. In that capacity, it prepared the brochure describing the study abroad program supplied to Paneno.

CAPA-USA and CAPA-UK are distinct, but affiliated, companies. CAPA-UK does not, and never has, owned, operated, or managed CAPA-USA, and CAPA-USA has never owned, operated, or managed CAPA-UK. While CAPA-UK and CAPA-USA have identical boards of directors, they have separate offices, officers, and employees. It has never loaned money to, signed, or cosigned any notes on behalf of, or guaranteed loans of, or otherwise financed CAPA-USA.

*CAPA-UK's Contacts with California*

CAPA-UK maintains no offices in California and does not employ any persons in California. CAPA-UK does not pay any taxes to California. CAPA-UK has never owned, operated, or managed any entity located or doing business in California. It does not have any bank accounts, real or personal property, telephone numbers, mailing addresses, or post office boxes in California. It does not own, lease or maintain any office or branch in California. It has never been registered to do business, held a license to do business, and has never otherwise been authorized to transact business in California. It does not maintain a registered agent within California. It does not file any type of government reports in California.

CAPA-UK has never applied for, nor received, a loan or other financing from any entity in California. It has never filed a lawsuit in California, and, other than this lawsuit, has never even been a party to a lawsuit in California or otherwise availed itself of California law.

CAPA-UK does not advertise in any local media or in any publication printed or distributed in California. It does not advertise in any media calculated to reach California.

CAPA-UK occasionally sends employees to California. On average, one or two representatives of CAPA-UK visit California once or twice a year to meet

with employees of CAPA-USA and to meet with students and representatives from California colleges and universities. No directors, officers, or employees of CAPA-UK have visited California to meet with representatives of PCC regarding the PCC Florence Program.

### Travel Arrangements for the PCC Florence Program

CAPA-UK does not enter into any contracts with any educational institution within California for the provision of international study programs. Rather, CAPA-USA contracts with the particular California educational institution. In the instant case, the vice-president of administrative services of PCC and the director of CAPA-USA's "U.S. Operations" executed the relevant contract.

Likewise, CAPA-UK did not enter into any contract with Paneno or any other California student regarding the PCC Florence Program. As with the educational institution contracts, CAPA-USA, not CAPA-UK, contracts with the individual California students who wish to participate in the study abroad programs.

According to Christian, the standard procedure, which was applicable to the PCC Florence Program, is that CAPA-USA approaches CAPA-UK for the pricing of a particular program for a particular semester. CAPA-UK provides CAPA-USA with the pricing of the program after obtaining such information from CAPA-UK's independent suppliers located in the country of interest (in this case, Italy). Upon the signing of a formal contract between CAPA-USA and the educational institution, CAPA-UK then contracts with the various independent suppliers of services, including accommodation providers, air and ground transportation providers, and sightseeing excursion providers. CAPA-UK pays these independent suppliers for their services. Students who participate in the study abroad programs send their checks to CAPA-USA, which then forwards the proceeds to CAPA-UK.

In April 2000, Paneno signed and returned an application to CAPA-USA in Irvine with his deposit check. The written application contained the terms of Paneno's participation in the PCC Florence Program, and included a release purporting to release CAPA-USA and its "employees, directors, officers, agents and affiliates" for any loss or damage.

For the PCC Florence Program, CAPA-UK contracted the services of another entity, Mitwohnzentrale,[2] to obtain apartment accommodations for the PCC Florence Program participants. Decisions pertaining to the selection

---

[2] Mitwohnzentrale is an association of companies that specialize in renting apartments throughout Europe.

of Mitwohnzentrale as the housing provider for the PCC Florence Program came from CAPA-UK's office in London.

### Paneno's Tragic Accident in Florence

In September 2000, Paneno traveled to Italy without incident and commenced the academic component of the program. He lived in an apartment in Florence with roommates who were also participating in the program.

On October 21, 2000, Paneno and a friend were on the apartment's balcony. When Paneno leaned against the balcony railing, a portion of it gave way, and Paneno fell six stories. He sustained serious injuries, including paralysis, as a result of his fall.

### Procedural History

### Paneno's Complaint

On August 10, 2001, Paneno initiated this lawsuit against CAPA-USA and PCC for premises liability and negligence. Paneno thereafter filed a first amended complaint alleging the same causes of action against the same two defendants.

### CAPA-UK's Motion to Quash Service of Summons

On or about June 9, 2003, CAPA-USA filed a motion for summary judgment.[3] In opposing that motion, Paneno admitted that he contracted with CAPA-USA and that he did not have any knowledge about the activities or involvement of CAPA-UK.

On April 8, 2002, Paneno filed a form amendment, naming "Centers for Academic Programs Abroad, Ltd." as Doe 2. Service was attempted by registered mail to CAPA-UK at its registered address in London. Thereafter, CAPA-UK specially appeared and moved to quash service of the summons and first amended complaint for lack of personal jurisdiction.

In opposing CAPA-UK's motion, Paneno argued that jurisdiction should lie over CAPA-UK because: (1) through CAPA-USA's marketing and sales activities in the United States, CAPA-UK tries to recruit California schools and students into its study abroad programs; (2) these activities constitute purposeful availment directly related to the cause of action alleged against

---

[3] The trial court denied CAPA-USA's motion on or about December 5, 2003, in part because there were disputed facts as to whether CAPA-UK was CAPA-USA's agent. We summarily denied CAPA-USA's writ petition on February 11, 2004.

CAPA-UK; and (3) that no CAPA entity actually existed in England; instead, the two CAPA entities were merely playing a shell game.

On August 29, 2002, the trial court granted CAPA-UK's motion.

This timely appeal followed.[4]

## DISCUSSION

### I. Standard of Review

■     When a nonresident defendant challenges personal jurisdiction, the burden shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that all necessary jurisdictional criteria have been met. The plaintiff can meet this burden only by the presentation of competent evidence in affidavits or declarations and authenticated documentary evidence. (*Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1054–1055 [85 Cal.Rptr.2d 611].) Affidavits or declarations consisting primarily of vague assertions of ultimate fact rather than specific evidentiary facts are not sufficient. (*Id.* at p. 1055.) Once the plaintiff has met the burden of demonstrating facts justifying the exercise of jurisdiction, the burden shifts to the defendant to demonstrate that the exercise of jurisdiction would be unreasonable. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*); *Serafini v. Superior Court* (1998) 68 Cal.App.4th 70, 77 [80 Cal.Rptr.2d 159] (*Serafini*).)

■     Thus, the process is essentially an evidentiary one and the applicable standard of appellate review is the familiar substantial evidence rule. Therefore, if there is conflicting evidence presented by the parties, we are called upon to determine whether the trial court's decision is supported by substantial evidence (*Serafini, supra,* 68 Cal.App.4th at p. 77; *Wolfe v. City of Alexandria* (1990) 217 Cal.App.3d 541, 546 [265 Cal.Rptr. 881]), and, in doing so, we resolve all conflicts in the relevant evidence "against the appellant and in support of the order" (*Wolfe*, at p. 546). If there is no conflict in the relevant evidence, the question is one of law as to which we exercise our independent judgment. (*Serafini*, at p. 77.)

### II. Jurisdiction

■     Pursuant to California's long-arm statute, California courts may exercise jurisdiction on any basis not inconsistent with the California or

---

[4] In its brief, CAPA-UK asserts that Paneno's appeal was not timely because Paneno's opening brief indicates that he was served with notice that the order quashing service was entered on August 29, 2003, and his notice of appeal was not filed until October 29, 2003, 61 days later. After reviewing the appellate record, we are convinced that Paneno's appeal was timely. He was served with notice of entry of the order granting CAPA-UK's motion on September 6, 2002. Any contrary representation in Paneno's opening brief appears to be erroneous.

United States Constitution. (Code Civ. Proc., § 410.10.) "A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons, supra,* 14 Cal.4th at p. 444, quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154]).) ■ In other words, the exercise of jurisdiction must be reasonable. (*Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264]; *Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 714 [46 Cal.Rptr.2d 888].)

■ Traditionally, courts may exercise either general or specific personal jurisdiction over a nonresident defendant. (*Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414 [80 L.Ed.2d 404, 104 S.Ct. 1868].) Because we conclude that CAPA-UK is subject to general jurisdiction, we do not reach the question of whether it also is subject to specific jurisdiction.

III. *General Jurisdiction*

■ General jurisdiction permits a court to exercise personal jurisdiction over a nonresident defendant when said defendant's activities are substantial or continuous and systematic, even if the cause of action is unrelated to the defendant's forum-related activities. (*Helicopteros Nacionales de Colombia v. Hall, supra,* 466 U.S. at p. 414; see also *Vons, supra,* 14 Cal.4th at pp. 445–446; *Serafini, supra,* 68 Cal.App.4th at pp. 78–80, quoting and relying upon *Perkins v. Benguet Mining Co.* (1952) 342 U.S. 437 [96 L.Ed. 485, 72 S.Ct. 413]; *Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1758 [46 Cal.Rptr.2d 191].) "Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction." (*Vons,* at p. 446.) "While minimum contacts suffice for specific personal jurisdiction, 'the standard for general jurisdiction is considerably more stringent.' [Citations]" (*Boaz v. Boyle & Co., supra,* 40 Cal.App.4th at p. 717.)

"Agency may confer general jurisdiction in the forum state over a foreign corporation." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 540.) In the context of parent-subsidiary corporation relationships, "neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business." (*Ibid.*) The "more" exists "where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities." (*Id.* at p. 541.) In those circumstances, "jurisdiction over the parent may be grounded in the acts of the subsidiary/agent." (*Ibid.*)

In other words, "if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent." (*Ibid.*; see also *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1093–1094 [128 Cal.Rptr.2d 683] (*DVI*); *Chan v. Society Expeditions, Inc.* (9th Cir. 1994) 39 F.3d 1398, 1405–1406 (*Chan*) [defining a general agent as when its forum representative provides services beyond mere solicitation and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services].)

The " 'representative services' " doctrine, a species of agency, "supports the exercise of jurisdiction when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's *own* business." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.) In other words, " '[i]f a parent uses a subsidiary to do what it otherwise would have done itself, it has purposely availed itself of the privilege of doing business in the forum.' " (*Ibid.*)

CAPA-UK and CAPA-USA admittedly do not have a parent-subsidiary relationship. However, as CAPA-UK candidly professes, "CAPA-USA functions as the United States sales, marketing, and pre-departure administration arm for CAPA-UK in the provision of international educational programs." Without CAPA-USA performing in that capacity, CAPA-UK would have had to handle such activities itself. As such, CAPA-USA performs a function compatible with, and assists CAPA-UK in the pursuit of, CAPA-UK's business. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543; *DVI, supra,* 104 Cal. App.4th at p. 1094.)

For example, CAPA-USA supplied brochures to potential program participants, including Paneno. In one such brochure, the entity generically referred to as "CAPA," indicated that it would "coordinate all of the logistics of [the] program including . . . accommodations," a function ascribed solely to CAPA-UK. Moreover, the program fee Paneno paid to "CAPA" pursuant to his contract with CAPA-USA included monies for arrangements made exclusively by CAPA-UK. Although the contract Paneno executed was with CAPA-USA, the release in that contract purports to release CAPA-USA's "affiliates," which presumably includes CAPA-UK given Christian's repeated declaration that the entities are "affiliated." Even the contract between PCC and "CAPA" blurs the distinction between the two CAPA entities; the contract refers to CAPA generically, was executed by the "Director, U.S. Operations," and describes functions attributable to both CAPA-UK and CAPA-USA.

These facts confirm that CAPA-UK is far different from the parent corporation in *Sonora Diamond*. Quite simply, it does engage in business operations closely connected to the business of CAPA-USA. (Contra, *Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 544–545.) Specifically, "CAPA-UK provides international educational programs, primarily through contractual associations with various colleges and universities throughout the world." With respect to the facts in the instant case, the student participants, including Paneno, were recruited and provided with all necessary predeparture information and documents solely by CAPA-USA. Under these circumstances, for purposes of this motion only, we conclude that sufficient facts exist to support the imposition of general jurisdiction over CAPA-UK. (See *Chan*, *supra*, 39 F.3d at p. 1405.)

This conclusion is particularly compelling herein given CAPA-UK and CAPA-USA's confusing use of the same generic trade name and the game "CAPA" appears to be playing. According to CAPA-USA's motion for summary judgment, CAPA-USA had nothing to do with the arrangements made for student accommodations abroad; "CAPA-UK . . . [is] the entity which actually organized the various elements of the PCC Florence program, which included, <u>inter alia</u>, student accommodations in Florence, air and ground transportation, and various sightseeing excursions," thereby relieving it of any liability to Paneno for injuries he suffered. On the flip side, according to CAPA-UK, CAPA-UK cannot be sued in California for any of its alleged negligence because it has no ties to California. Basically, by setting up two related corporate entities—one to recruit and enter into contracts with students and one to provide all necessary accommodations for them—"CAPA" is attempting to avoid answering to any claim for negligence in California. We will not allow such trickery to be used to deny Paneno his day in court.

Accordingly, ample facts have been presented supporting the exercise of general jurisdiction over CAPA-UK.[5]

## DISPOSITION

The order granting CAPA-UK's motion to quash is reversed. Paneno is entitled to his costs on appeal..

Nott, Acting P. J., and Doi Todd, J., concurred.

A petition for rehearing was denied June 17, 2004, and respondent's petition for review by the Supreme Court was denied August 18, 2004. Chin, J., did not participate therein.

---

[5] We stress that only an order denying a motion to quash is before us, and nothing herein should be construed as determinative as to the merits.