[No. D048963. Fourth Dist., Div. One. Mar. 13, 2007.]

AQUILA, INC., Petitioner, v.
SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CITY AND COUNTY OF SAN FRANCISCO et al., Real Parties in Interest.

558

**COUNSEL**

Leboeuf, Lamb, Greene & Macrae, Bennett G. Young, Seth W. Wiener, Sean R. D. Gorman and Charles A. Moore for Petitioner.

No appearance for Respondent.

Cotchett, Pitre Simon & McCarthy, Joseph W. Cotchett, Nancy L. Fineman, Nanci E. Nishimura and Steven N. Williams for Real Parties in Interest.

**OPINION**

**HUFFMAN, J.**—This writ proceeding arises out of a number of coordinated antitrust actions brought by a group of independent plaintiffs, the City and County of San Francisco et al. (plaintiffs), in which plaintiffs seek to establish a conspiracy by various energy-related defendants to manipulate prices in the retail natural gas market in California. (Bus. & Prof. Code, § 16700 et seq.) Plaintiffs sued, among others, defendant and petitioner Aquila, Inc. (Aquila), a publicly regulated utility operating in the Midwest, asserting that it participated in manipulating the price of natural gas in California by falsely reporting natural gas trades to price indices and engaging in wash trades.

Aquila brought a motion to quash service of summons, challenging the trial court's exercise of personal jurisdiction over it for lack of sufficient ties to California, asserting that instead, all the alleged minimum contacts claimed by plaintiffs were actually carried out by its independent subsidiary companies, not Aquila (e.g., Aquila Merchant Services, Inc., known as AMS). The motion to quash was denied, as the trial court found a sufficient basis for specific jurisdiction under the theory that Aquila had purposefully availed itself of opportunities in the State of California. (Code Civ. Proc., § 418.10; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*).) The trial court did not rule on an alternative basis for general jurisdiction, the " 'representative services' doctrine." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 543 [99 Cal.Rptr.2d 824] (*Sonora Diamond*).)

In its petition for writ of mandate, Aquila argues the trial court erred when it denied its motion to quash service of summons, because the evidence in the

record, properly analyzed, shows that it never participated in the California natural gas market nor otherwise purposefully availed itself of forum contacts. Aquila did not have any physical presence in California, nor any substantial, continuous and systematic business contacts with California, sufficient to justify an assertion of specific or general jurisdiction.

■ We conclude the exercise of specific jurisdiction was not proper, because plaintiffs did not bear their burden of demonstrating the existence of sufficient minimum contacts between Aquila and this state for purposes of these allegations. Although the trial court did not find it necessary to rule upon the representative services doctrine under general jurisdiction theories, that issue must be discussed here because the motion proceedings squarely presented it and it remains for decision, based on our conclusions on specific jurisdiction. In any case, the record does not support any application of the representative services doctrine under the facts of this case. We grant the relief requested in the writ petition.

## FACTUAL AND PROCEDURAL HISTORY

### A. Nature of Lawsuit and Identity of Parties

The plaintiffs are a number of public entities and energy customers. In their coordinated antitrust complaints, they allege that from 1999 to 2002, Aquila and all other defendants falsely reported natural gas price information and engaged in sham or wash trades to artificially inflate the price of natural gas in California. These allegations were brought against both the parent company Aquila and its subsidiary AMS. Until March 2002, Aquila was known as UtiliCorp United, Inc. (and also used the name Broad Street Oil and Gas Co.). (Defendant AMS, the subsidiary, which was formerly named Aquila until 2002, does not dispute personal jurisdiction.) We will use their current names in our discussion, such that Aquila is the parent company and AMS is the subsidiary.

Aquila is a public utility headquartered in Missouri that operates electricity and natural gas distribution utilities in six states in the Midwest. It includes both merchant services divisions and a global networks group. The merchant services business is conducted by subsidiaries, such as AMS, which provide capital services, electric power generation and natural gas gathering assets. Plaintiffs contend the parent company, Aquila, should be subject to jurisdiction in California due to the nature of its business dealings and transactions in California and by having caused injuries within California. They allege an agency relationship between Aquila and AMS.

As to all defendants, including Aquila, plaintiffs allege that there were sufficient minimum contacts within California "to make the exercise of

jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice. Each Defendant participates, or during the relevant period did participate, in the California market through the production, distribution, transmission or sale or trade of natural gas, or natural gas transportation in California, or by having or using a facility located in California to facilitate the transmission, distribution, sale or trade of natural gas in California." They also allege each defendant or agent transacted business in California and carried out unlawful conduct, which had effects in California.

### B. *Motion to Quash*

Aquila moved to quash service of summons on the grounds that it was not properly subject to suit in California, for lack of sufficient minimum contacts to justify personal jurisdiction. (Code Civ. Proc., § 418.10.) It argued plaintiffs could not establish general jurisdiction because Aquila, a parent corporation, had insufficient contacts with California, and that plaintiffs could only show any potentially actionable activity by its subsidiaries. It asserted that Aquila "never produced, distributed, transported, sold or traded natural gas in California, and never reported any natural gas trades to any price index." Aquila also opposed the exercise of general jurisdiction over it based on any application of the representative services doctrine (which is similar to an agency theory based on a subsidiary's activities).

Aquila further contended the trial court could not exercise specific jurisdiction over it because it had never purposefully availed itself of the benefit of conducting business in this state, and because the necessary nexus between the litigation, the forum, and the defendant did not exist. Aquila thus contended an exercise of specific jurisdiction would offend traditional notions of fair play and substantial justice. (*Vons, supra,* 14 Cal.4th 434, 474.)

In support of its motion, Aquila submitted a declaration from its general counsel and corporate secretary, Christopher Reitz. He stated that Aquila is a Delaware corporation which is not registered to do business in California and has never done so. Aquila never had or used a facility located in California to facilitate the production, transportation, distribution, sale or trade of natural gas in California. Also, Aquila never reported wholesale gas trades to trade journals or any other published natural gas indices, nor did it solicit business, advertise or sell any goods, including natural gas, in California.

The motion to quash and supporting declarations further stated that Aquila had no offices or other property in California. None of its officers or employees or other representatives was based in California, nor were its records maintained here. Aquila and AMS maintain separate books and

records and Aquila does not manage or control its subsidiary AMS's natural gas operations in California.

Plaintiffs opposed the motion and submitted extensive materials for judicial notice, to argue Aquila had purposefully availed itself of the benefits of conducting business in California, as alleged in the complaint, so that specific jurisdiction was authorized. (Evid. Code, § 452.) Also, plaintiffs argued that general jurisdiction was appropriate on an agency theory, based on the activities of AMS in California on behalf of the parent corporation (representative services doctrine).

In opposition to the motion, plaintiffs sought judicial notice of documentation of regulatory and contractual activities of Aquila and other entities, to be described more fully later in this opinion. Briefly, these included four particular items at issue here. First, in October 2000, Aquila's predecessor UtiliCorp sold a weather derivative contract for a five-year term to plaintiff Sacramento Municipal Utilities District (SMUD); this is a risk management device for the payment of money if precipitation levels are too low for electricity generation purposes. The contract has a New York choice of law and forum clause. After several amendments to the contract, in January 2004, Aquila entered into an assignment and assumption agreement, to guarantee the obligations of AMS, which had been performing the contract. AMS was described as the party to the master agreement and Aquila was described as the credit support provider of AMS. Plaintiffs also submitted several trade journal articles about Aquila's activities and its energy merchant subsidiary business and risk management expertise; some of these journals were apparently distributed in California. (These were not considered by the trial court.)

Second, Aquila as the named insured (also on behalf of its subsidiaries, associated or allied companies and partnership interests), purchased a Rhode Island property insurance policy for 38 real properties nationwide, at least one of which is in California (Stockton CoGen Company, an energy cogeneration facility). This policy was issued in 2002 and includes coverages for physical loss or damage such as earth movement, time element, or extra expense.

Third, plaintiffs provided administrative opinions issued by the California Public Utilities Commission (PUC), including decisions and orders pertaining to proceedings in which Aquila's subsidiaries had participated, such as a potential acquisition of a gas storage facility in Lodi, California by an entity partially owned by AMS. No such acquisition was ever completed. Some of these older documents also contained summaries or service lists that included Aquila's predecessor, UtiliCorp.

Fourth, plaintiffs submitted filings (Forms 10-K) made in 2002 by Aquila, defined as "the Company," including both the parent and subsidiaries, with the United States Securities and Exchange Commission (SEC). These forms listed properties in which Aquila's subsidiaries had an ownership interest, including the Stockton CoGen facility in California.

In its reply papers, Aquila contended each of these alleged contacts was carried out by a subsidiary of Aquila, not Aquila, and that none of them amounted to a substantial contact for jurisdictional purposes. Although the 2000 SMUD weather derivative contract was subject to a related guarantee agreement by Aquila, neither agreement nor the other alleged contacts had any connection to plaintiffs' claims regarding natural gas market activities. For example, the weather derivative contract was marketed by Aquila's predecessor, UtiliCorp, to act as a hedge against fluctuations in electricity prices caused by precipitation levels that affected hydroelectric facilities, and therefore it related to both parties' participation in the electricity market, not the natural gas market. Also, although Aquila subsidiaries held partnership interests in California energy generating facilities, Aquila as the parent company did not. Aquila's predecessor's listing on PUC service lists was due to mistake or inadvertence. Aquila thus opposed any finding of specific jurisdiction.

Additionally, Aquila formally objected that the court should not take judicial notice or receive into evidence the exhibits submitted by plaintiffs to show the alleged contacts. Aquila argued these exhibits were not proper matters for judicial notice for numerous reasons, such as hearsay and lack of sufficient authentication or relevance. Also, the documents could not properly be judicially noticed for the truth of their factual contents to establish sufficient minimum contacts.

Aquila also sought to have a number of the documents sealed as confidential trade materials, and some of them were submitted in a redacted form as proposed by the attorneys. Plaintiffs sought an opportunity to conduct further discovery if necessary to authenticate any documents challenged.

## C. *Ruling*

The trial court issued a tentative ruling and heard argument. As a foundational matter, the trial court concluded that, despite the objections by Aquila, judicial notice was proper of plaintiffs' documents on several grounds, and Aquila had not brought forward its own persuasive evidence. First, the court stated that in connection with the related motion to seal some of these confidential trade documents, which had been produced through discovery, Aquila had authenticated them through an attorney declaration, and therefore

their reliability was sufficiently established for various purposes through "self-authentication," as matters "not reasonably subject to dispute." In reaching this conclusion, the court relied on the general purpose of judicial notice, to recognize the existence of a matter of law or fact without the necessity of formal proof. (Evid. Code, § 450 et seq.)

Using this reasoning, the court first ruled the contracts with SMUD "are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) Those contracts are not pled in plaintiffs' complaint, but were used to show minimum contacts of Aquila and its predecessor.

Next, the court took judicial notice of the submitted decisions of the PUC, as documents not reasonably subject to dispute, which it deemed to be properly admitted to show Aquila has minimum contacts in California. The court noted that the PUC had concerns about the economic stability of some Aquila-related entities in connection with an application to acquire an interest in a gas storage facility in Lodi, California. That application was made by an entity jointly owned by AMS and a third party, but AMS withdrew from that application. Also, Aquila's predecessor UtiliCorp was included on some PUC service lists as an interested party.

Similarly, the court granted plaintiffs' request for judicial notice of Aquila's SEC filings, made on behalf of "the Company," which was defined as petitioner and its subsidiaries. The court decided these documents showed Aquila has contacts in California. For example, a company Form 10-K mentioned Stockton CoGen Company as owned in part by AMS (having a 50 percent interest in a coal-fired cogeneration facility in California). The court said, "These documents are not subject to dispute and are capable of immediate and accurate determination as the proxy statements may be accessed by anyone visiting the SEC's website."

With respect to the property insurance policies, which were produced during discovery and filed under seal at Aquila's request, they were admitted because they were self-authenticated by Aquila by being designated "protected material." The policies listed the named insured as Aquila and any of its subsidiaries or associates or allied company and/or partnership interests, and among the 38 insured locations, one was "Stockton CoGen Company"; AMS had an indirect 50 percent partnership interest in that California energy-generating facility. The court believed such documents are not reasonably subject to dispute and should be judicially noticed.

Thus, on the merits, the trial court mainly relied on those four particular contacts as shown by judicially noticed documents to support the assertion of

specific jurisdiction over Aquila. The court stated that the SMUD contracts alone were sufficient to justify denial of the motion to quash, because "the SMUD contracts establish Aquila intended to benefit from its relationship with SMUD—and California energy consumers. The [PUC] decisions, the SEC filings, and the insurance policies further document Aquila's intent to interject itself into California commerce and benefit from the forum. In light of California's policy to authorize the broad exercise of jurisdiction, the evidence presented supports this policy since there is no violation of Aquila's rights to due process and Aquila was on reasonable notice that it may be hauled [*sic*, haled] into Court in California based on its activities within the state."

With respect to the representative services doctrine (pertaining to general jurisdiction), the court concluded that it need not be addressed, since the evidence was otherwise sufficient to establish Aquila's requisite minimum contacts with California, such that exercising jurisdiction over it would not offend the concept of fair play and substantial justice.

After the court denied its motion to quash, Aquila filed this petition for a writ of mandate to overturn the order. (Code Civ. Proc., § 418.10, subd. (c).) We subsequently issued an order to show cause and received further briefing.

## DISCUSSION

Aquila first contends the trial court erred in ruling it had such substantial, continuous and systematic contacts with California, as to justify specific jurisdiction to litigate plaintiffs' claims against it. It argues that under a proper interpretation of the record, each of the alleged contacts was by a subsidiary of Aquila, not Aquila itself, and the trial court's findings of the existence of such contacts are not supported by substantial evidence, as required for a finding of specific jurisdiction. On this point, Aquila objects that the trial court exceeded the scope of appropriate judicial notice in making its ruling. Moreover, none of the asserted contacts had any sufficient connection to the claims plaintiffs are actually making regarding the natural gas market, as would be required for specific jurisdiction. (*Vons, supra*, 14 Cal.4th 434, 445–446.)

Aquila further argues there is no adequate basis for an exercise of general jurisdiction, such as would be authorized by the representative services doctrine. Also, Aquila claims that even though its predecessor admittedly contracted with SMUD, the nature of that weather derivative contract fails to demonstrate the substantial, continuous and systematic contacts with California necessary to support a finding of general jurisdiction.

We first outline our standard of review and basic principles for analyzing jurisdictional questions. We then address the asserted bases for either specific or general jurisdiction.

I

## STANDARDS OF REVIEW FOR QUESTIONS OF JURISDICTION; JUDICIAL NOTICE

■ Due process allows state courts to assert personal jurisdiction over nonresident defendants who were served with process elsewhere only if those defendants have such minimum contacts with the state to ensure that such an assertion of jurisdiction will not violate " ' "traditional notions of fair play and substantial justice." ' " (*Vons, supra,* 14 Cal.4th 434, 444–445, 474–475.) It is well established that only " ' "random," "fortuitous," or "attenuated" contacts' " do not support an exercise of personal jurisdiction. (*Id.* at p. 445.) In analyzing such issues, the courts have rejected any use of " 'talismanic jurisdictional formulas.' " (*Id.* at p. 460.) Rather, " ' "the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." ' [Citation.]" (*Ibid.*)

■ When a motion to quash is properly brought, the burden of proof is placed upon the plaintiff to establish the facts of jurisdiction by a preponderance of the evidence. (*Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 533 [257 Cal.Rptr. 278].) This may be done through presentation of declarations, with opposing declarations received in response. " '[W]here there is a conflict in the declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination of that court is supported by substantial evidence. [Citations.]' [Citation.]" (*Ibid.*)

"On review, the question of jurisdiction is, in essence, one of law. When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, we review independently the trial court's conclusions as to the legal significance of the facts. [Citations.] When the jurisdictional facts are not in dispute, the question of whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo. [Citation.]" (*Dorel Industries, Inc. v. Superior Court* (2005) 134 Cal.App.4th 1267, 1273 [36 Cal.Rptr.3d 742] (*Dorel*); see *Vons, supra,* 14 Cal.4th 434, 449.) The ultimate issue of whether an exercise of jurisdiction is fair and reasonable is a legal determination subject to de novo review on appeal. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 111 [37 Cal.Rptr.3d 258] (*Automobile Antitrust*).)

In resolving the legal questions presented, we must also evaluate the state of the record in light of the trial court's judicial notice rulings. "Although a court may judicially notice a variety of matters [citation], only *relevant* material may be noticed. 'But judicial notice, since it is a substitute for proof [citation], is always confined to those matters which are relevant to the issue at hand.' [Citation.]" (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73] (*Mangini*).) Further, when a court takes judicial notice of official acts or public records, it does not also judicially notice " 'the truth of all matters stated therein.' [Citations.] '[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom.' [Citation.]" (*Id.* at pp. 1063–1064.) The Supreme Court has clarified these standards as follows: "When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable. [Citation.]" (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 457, fn. 9 [84 Cal.Rptr.2d 843, 976 P.2d 214] (*StorMedia*).)

When a trial court's judicial notice rulings are challenged, harmless error standards should apply: "The Evidence Code declares the party's right and the trial judge's duty, but does not deal with the problems of appellate review and reversible error. Hence, even though the matter called for compulsory notice, or was appropriate for optional notice, and the appellant fully complied with the procedural requirements, refusal to take notice is merely error. Whether it is reversible error depends on the state of the record, and also involves considerations of estoppel and waiver. [Citations.] Likewise, the improper taking of notice is subject to harmless error analysis. [Citation.]" (1 Witkin, Cal. Evidence (4th ed. 2000) Judicial Notice, § 44, p. 137.)

Before looking to the record, we first set forth the rules regarding minimum contacts as bases for findings of general or specific jurisdiction.

## II

### *BASIC JURISDICTION RULES AND PROCEDURES*

"The concept of minimum contacts embraces two types of jurisdiction—general and specific. General jurisdiction results where the defendant's contacts with the forum state are so 'systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts.' [Citations.] Specific jurisdiction results

when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 536.)

■ In analyzing the exercise of specific jurisdiction under these criteria, courts must additionally evaluate "the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies." ' [Citation.]" (*Vons, supra,* 14 Cal.4th 434, 447–448.)

The trial court's ruling appropriately recognized that in deciding the motion to quash before it, plaintiffs had "the initial burden of demonstrating facts . . . justifying the exercise of jurisdiction. [Citation.]" The court also stated that once plaintiffs make such a showing of minimum contacts with the forum state, "the burden shifts to the defendant to present a *compelling* case demonstrating that the exercise of jurisdiction by our courts would be unreasonable," citing *Automobile Antitrust, supra,* 135 Cal.App.4th 100. The merits of the complaint are not yet at issue in that inquiry. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 540.)

Even though the trial court in its ruling recognized the appropriate burden-shifting procedure here, it nevertheless commented that there was a "notable" absence of persuasive argument and evidence in rebuttal from Aquila in the reply papers (which included the supplemental declarations for this motion and the motion to seal). This comment was apparently based on disagreement with Aquila's arguments against the appropriateness of the requested judicial notice, which the court believed amounted to less than a "compelling" showing that jurisdiction should not be exercised. We will discuss those substantive issues in connection with the two different theories plaintiffs are pursuing to assert personal jurisdiction over Aquila.

## III

### *SPECIFIC JURISDICTION: PURPOSEFUL AVAILMENT*

■ Where minimum contacts are disputed, "the question whether 'jurisdiction may be constitutionally exercised depends upon the circumstances of

each individual case. . . . [T]he analysis is concerned with weighing the various relevant "contacts" by the foreign corporation within the state attempting to exercise jurisdiction.' [Citation.]" (*Sonora Diamond, supra,* 83 Cal.App.4th at pp. 535–536.) Even if a wholly owned subsidiary of a parent corporation is properly subject to state court jurisdiction, that does not mean that the parent is also properly subject to jurisdiction in California courts. (*Id.* at p. 553.) For each factor appearing in the record and relied on by the trial court, we evaluate the parties' arguments respecting the appropriateness of the judicial notice taken, both as to admissibility and persuasiveness.

## A. *"Purposeful Availment" Evidence*

Plaintiffs' showing through their judicial notice requests relied chiefly on four types of contacts: (1) Aquila's weather derivative contract with SMUD and guarantee; (2) its property insurance policy for itself and subsidiaries covering 38 properties, including the Stockton CoGen Company property (owned in part by AMS, representing a 50 percent interest in a cogeneration facility in California); (3) Aquila's or its predecessor's notification of opportunities for participation in PUC proceedings, e.g., in connection with an application to acquire an interest in a gas storage facility in Lodi, California, and financial support (i.e., an Aquila-related entity, which made but withdrew this application); and (4) SEC filings reporting an Aquila subsidiary's interest in the California business, Stockton CoGen Company. We discuss these in turn.

First, however, we address Aquila's objections to the judicial notice taken and the request by plaintiffs for an opportunity for further discovery if any authentication problems remain. Although Aquila continues to argue that neither the weather derivative contract, the insurance policy, nor the regulatory filings were properly authenticated or certified, its main substantive objections are that the trial court should not have taken judicial notice of these documents for the truth of the matters asserted in them, and they are irrelevant. For example, the contents of the contracts are not properly proven by judicial notice. (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145 [37 Cal.Rptr.2d 718].) The insurance policy constitutes hearsay regarding whether Aquila owned property in California, as opposed to its subsidiaries as owners. (Evid. Code, § 1200, subd. (b).) As to both the SEC and PUC filings, the trial court used them as proof that Aquila as the parent had significant California contacts through ownership of property here, and participation in regulatory proceedings here. However, Aquila filed its general counsel's supplemental declaration to rebut these points, although this was apparently discounted by the trial court.

As to all those judicial notice problems, we think it is unnecessary to focus on the technical authentication issues, or any request for further discovery

proceedings, and instead we consider whether the trial court was justified in focusing on the substance or truth of those documents, and whether it interpreted them properly. (*Mangini, supra*, 7 Cal.4th at p. 1063; *StorMedia, supra*, 20 Cal.4th 449, 457, fn. 9.)

1. *SMUD Contract with Aquila: Weather Derivative Contract*

This 2000 weather derivative contract is a risk management tool obligating Aquila and/or AMS to pay money to SMUD if rainfall levels were low and impeded hydroelectric generators from operating properly. Originally, Aquila's predecessor UtiliCorp was the contracting party, and after several amendments to the contract, Aquila guaranteed the obligations of AMS, which had been performing the contract. Through this contract, SMUD protected itself from exposure to increased costs of purchasing electrical power. The purpose of this type of contract was explained in 2002 testimony to Congress by Aquila's chairman, as allowing a municipal utility to cushion the risk of having to purchase last-minute electrical power at high prices on the open market when such hydroelectric generators cannot operate.

█ The contract includes clauses for New York choice of law and forum selection, which tends to weigh against a conclusion from this document that Aquila itself or its predecessor sought to do significant business in California. Under *Vons, supra*, 14 Cal.4th at page 449, it is not enough for a nonresident defendant to become subject to the specific jurisdiction of this state simply by entering into a contract with a California resident. The court in *Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 907 [73 Cal.Rptr.2d 105], states that a party's entry into a contract with an out-of-state party does not automatically demonstrate purposeful availment in the other party's home forum, particularly where the agreements were governed by out-of-state law.

█ Even though Aquila provided a guarantee to its subsidiary AMS on this contract with SMUD, the guarantee was only for the payment obligation, not for performance such as AMS, a merchant trading operation, could render. The primary purpose of the main contract remained a concern with electrical power costs. Under *Sonora Diamond, supra*, 83 Cal.App.4th at page 548, a parent company's guarantee alone does not provide a basis for the exercise of jurisdiction. Plaintiffs also provided copies of Aquila's publicity about its business in nationally distributed trade journals, but this was not specific to soliciting business from California residents. (See *Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062–1065 [29 Cal.Rptr.3d 33, 112 P.3d 28] [a defendant which purposefully availed itself of the California market, through use of a Web site and advertising seeking out California residents, was found to be subject to specific jurisdiction].) Contrary to the trial court's conclusion, Aquila brought forth evidence in its reply

papers that clarified the role of AMS, as opposed to Aquila, in this matter. Even if Aquila's predecessor apparently purposefully availed itself of California opportunities through this contract, the reply showing made (that the subsidiary was conducting these activities and that they had no substantial relationship to the actual claims by plaintiffs) weighs strongly against a finding of specific jurisdiction regarding the parent company.

On balance, the judicial notice taken of the substance of this SMUD contract does not adequately show that Aquila or its predecessor purposefully availed itself of the benefits of forum contacts through this particular relationship with SMUD, so as to create the kind of relationship with California natural gas consumers to justify specific jurisdiction on these claims.

## 2. *Property Insurance*

This was a Rhode Island policy issued to Aquila (parent and subsidiaries) for 38 real properties, one of which was in California. The policy listed the named insured as "Aquila and any subsidiary or associated or allied Company and/or partnership interest," and among the 38 insured locations, one was Stockton CoGen Company (in which AMS had an indirect 50 percent partnership interest). Aquila admits that other subsidiaries of AMS also had partnership interests in five other energy-generating projects in California. However, this was not true of Aquila, which did not do business on its own behalf in California.

"When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable. [Citation.]" (*StorMedia, supra,* 20 Cal.4th 449, 457, fn. 9.) According to Aquila, even though it did obtain such an extensive insurance policy, its benefit to its indirect subsidiary's California property "would, at most, constitute a random and fortuitous contact, rather than part of a concerted effort by Petitioner to interject itself into California commerce and benefit from the forum. The randomness of the contact is illustrated by the fact that the alleged insurance policy shows that Petitioner also obtained coverage for 37 properties outside California." We agree with this contention, because one cannot conclude from the face of the policy that it was Aquila, rather than a subsidiary, that owned this property in California, nor that the policy had a substantial connection to these claims. This is not the type of contact of a parent company that demonstrates its own purposeful availment of forum benefits by "interjecting itself into California commerce." (See *Dorel, supra,* 134 Cal.App.4th at p. 1276 [foreign parent's provision of insurance coverage for local subsidiary's California warehouse did not support finding of jurisdiction].)

Moreover, the antitrust claims here do not relate to the real property in which Aquila's subsidiary had an indirect ownership interest. The insurance policy, for physical loss or damages, does not cover antitrust claims. Plaintiffs' showing is at best inconclusive regarding the insurance policies.

3. *PUC Proceedings*

In 1997 through 1998, Aquila's predecessor, UtiliCorp, was listed on PUC service lists. Aquila's various subsidiaries participated in regulatory proceedings before the PUC, on their own behalf, relating to the California gas market during the 1999 through 2002 time period. "UES," a subsidiary of UtiliCorp (the predecessor of Aquila), evidently participated in some such proceedings, but pre-1999, before the timeframe of the complaint. However, during the relevant time period, Aquila was not shown to have participated before the PUC on its own behalf, nor was it shown that it violated any PUC orders or rulings arising out of those proceedings.

In its general counsel's declarations, Aquila denied participating in the California gas market by producing, distributing, transporting, selling or trading natural gas in California, or soliciting business, advertising or selling any goods, including natural gas, in California. However, at oral argument below, the trial court noted that a PUC commissioner in 2002 stated that there were concerns about the economic stability of some Aquila-related entities, in connection with an Aquila subsidiary's application to acquire an interest in the gas storage facility in Lodi, California. That application was made by an entity jointly owned by AMS and a third party, but AMS withdrew from that application.

In Aquila's reply papers, clarification was provided that it was AMS, not the parent company, that participated in the PUC proceedings about potentially providing operational and financial support for the Lodi project, which never occurred anyway, such that Aquila did not have significant contacts in this manner. Thus, plaintiffs did not substantially show that Aquila ever provided financial support or management expertise to any gas storage facility in California. It has been held that a parent company's provision of such financial support to a subsidiary would not create jurisdiction over the parent in any event. (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 547.)

Also in reply, Aquila noted that plaintiffs withdrew an exhibit 4 (which was a list of California natural gas suppliers in 2000 that included UtiliCorp/Aquila), as it was inaccurate, and it is no longer offered here.

These PUC decisions and service lists, even if admissible for the truth of their contents, lacked relevance and persuasiveness with respect to any significantly active role of this defendant Aquila in the natural gas market, the subject of the complaint.

## 4. SEC Filings

Plaintiffs obtained judicial notice of Aquila's SEC filings, which were made on behalf of "the Company," defined as petitioner and its subsidiaries. These Forms 10-K showed Aquila's subsidiary AMS had a partial interest in Stockton CoGen Company (which had a partial interest in a cogeneration facility in California). The court ruled, "These documents are not subject to dispute and are capable of immediate and accurate determination as the proxy statements may be accessed by anyone visiting the SEC's website." Even so, the appropriateness of a judicial notice request depends on a showing of substantive relevance, as well as procedural admissibility. The proper interpretation of the document remains disputable. (*StorMedia, Inc., supra,* 20 Cal.4th 449, 457, fn. 9.) Aquila's filing of these comprehensive securities documents on behalf of "the Company" (including its subsidiaries) does not demonstrate minimum contacts of the parent company with California. Substantial evidence does not support this finding of specific jurisdiction.

## B. *Relationship of Plaintiffs' Claims to Aquila's Contacts with California*

The "purposeful availment" theory next requires a showing that the defendant's allegedly relevant business contacts are sufficiently related, for jurisdictional purposes, to the subject matter of the controversy (i.e., plaintiffs' claims that defendant conspired to manipulate the price of natural gas in California through sham sales and false reporting of gas trades to price indices). Plaintiffs rely on the four major categories of contacts outlined above as showing, in their view, that a preponderance of the evidence supports a conclusion that Aquila must have conducted activities in California predominantly directed toward the natural gas market.

We seek to determine whether there is a substantial nexus or connection between Aquila's forum activities and plaintiffs' claims. (*Vons, supra,* 14 Cal.4th at pp. 452–458; *Sonora Diamond, supra,* 83 Cal.App.4th at pp. 535–536.) Considerations of fairness and substantial justice apply. (*Vons, supra,* at pp. 452–458; *Sonora Diamond, supra,* at pp. 535–536.)

With respect to the SMUD weather derivative contract, its predominant purpose was shown to be to insulate the utility from variations in electricity prices, with the subsidiary as contracting party. At the hearing on the motion, Aquila's attorney argued that since the evidence before the court mainly showed the SMUD contract involved electricity and the payment of money, it had not also been connected to a broader context of the natural gas market. The related financial guarantee provided by Aquila does not provide a basis for connecting the parent company with the conduct alleged in the complaint, regarding conspiracies in the natural gas market. (*Goehring, supra,* 62

Cal.App.4th at p. 907; *Dorel, supra*, 134 Cal.App.4th at p. 1276; *Sonora Diamond, supra*, 83 Cal.App.4th at p. 548.)

The remaining items, the insurance policy and the regulatory records, also fail to substantially demonstrate Aquila's involvement with the natural gas market to the extent required for specific jurisdiction. Rather, plaintiffs make general allegations that "Aquila's contacts with California are connected to the benefits it received from its connection to the natural gas market . . . ." Although it is not reasonably disputable that today's energy markets are closely interconnected, with regard to electricity and natural gas and other forms of power, more than general allegations of interconnectedness are still required to satisfy specific jurisdictional standards. Plaintiffs' allegations relate chiefly to defendants' reporting of natural gas prices to price indices, or sham purchases and sales of natural gas in California. These contacts between Aquila and California do not constitute substantial evidence of a close enough connection to those claims as to show Aquila purposefully availed itself of the privilege of doing business in this state.

IV

## GENERAL JURISDICTION: REPRESENTATIVE SERVICES DOCTRINE

In the ruling before us, the trial court concluded that it need not reach the applicability of the "representative services" doctrine (a theory of general jurisdiction), since it believed other evidence established that specific jurisdiction should be asserted over Aquila. As set forth above, the record does not support the latter conclusion. We therefore examine the record for any sufficient basis for the exercise of general jurisdiction.

### A. *Standards of Review*

■ A party seeking to have a court assert general jurisdiction over a nonresident defendant must be able to show that the defendant's contacts in the forum state are " 'substantial . . . continuous and systematic.' [Citations.]" (*Vons, supra*, 14 Cal.4th 434, 445–446.) Such wide-ranging contacts make it unnecessary for the particular cause of action at issue to be specifically connected with the defendant's business relationship to the forum. (*Ibid.*, citing *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264].)

■ One justification for the assertion of general jurisdiction to a non-resident defendant is the representative services doctrine. Under that theory, "the contacts of a local agent through which a foreign principal acts may be

imputed to that foreign defendant. [Citations.] In such circumstances, agency principles apply to confer general jurisdiction in California over a nonresident defendant corporation. [Citation.]" (*Automobile Antitrust, supra,* 135 Cal.App.4th 100, 119.)

 To show that the representative services doctrine applies to a defendant, the plaintiff must show evidence of agency, such that "the alleged principal had the right to control the activities of the alleged agent. [Citations.] Plaintiffs must show more than mere ownership or control of a local subsidiary by a foreign parent corporation. [Citations.] The foreign company must exercise a highly pervasive degree of control over the local subsidiary. It must veer into management and day-to-day operations of the local subsidiary in order to apply the representative services doctrine. [Citations.] An exercise of general jurisdiction under the representative services doctrine is only appropriate *if the control of the subsidiary is so pervasive and continual that the local subsidiary functions as an agent or instrumentality of the parent corporation,* despite the maintenance of separate corporate structures. [Citations.]" (*Automobile Antitrust, supra,* 135 Cal.App.4th 100, 120, fns. omitted, italics added.)

Where such evidence is produced to show the parent corporation's pervasive and continual control of the subsidiary's activities, then the parent and subsidiary should be treated as one entity for purposes of jurisdiction. This is normally not required except in cases of fraud or injustice. (*Automobile Antitrust, supra,* 135 Cal.App.4th at p. 121, citing *F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 797 [30 Cal.Rptr.3d 407] (*F. Hoffman-La Roche*).)

 In some cases, the subsidiary company is not truly a separate entity, but is merely an arm of the parent company. Where the services provided by the subsidiary company in the local jurisdiction " ' "are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services" ' " then general jurisdiction may be exercised over the parent as well as the subsidiary company. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.) In such a case, the local subsidiary is performing functions that only assist the parent in the pursuit of the parent's *own* business. (*Ibid.*) However, this doctrine does not support general jurisdiction if "the parent is merely a holding company whose only business pursuit is the investment in the subsidiary." (*Ibid.; Dorel, supra,* 134 Cal.App.4th at p. 1277.)

Examples of interaction between parent and subsidiary companies that have not been found sufficient to demonstrate this kind of agency and control for jurisdictional purposes include *Dorel, supra,* 134 Cal.App.4th at pages 1275 to 1277, in which it is explained that a parent's guarantee of a lease for a subsidiary was within the "normal parent-subsidiary relationship," and did not amount to a forfeiture of the separateness of the two entities. Likewise, where the parent corporation provided insurance coverage for a subsidiary on a warehouse located in California, that activity was not found to go beyond the normal parent-subsidiary relationship, so as to allow an agency finding. (*Id.* at p. 1276.)

Next, in *Sonora Diamond, supra,* 83 Cal.App.4th 523, 547, the court commented that a parent's guarantee of a subsidiary's financial obligations "did not go beyond what is normally expected of an owner of the stock of an unprofitable subsidiary corporation. [Citations.]"

Also, in *F. Hoffman-La Roche, supra,* 130 Cal.App.4th 782, 801, the court ruled that consolidated financial reporting between parent and subsidiary is "typical and actually expected of affiliated or wholly owned companies, and such facts do not establish agency for purposes of jurisdiction. [Citations.]" Rather, this can be considered a normal incident of ownership, as would be expected within the parent-subsidiary business context. (*Ibid.*; see also *Sonora Diamond, supra,* 83 Cal.App.4th at pp. 549–550.)

 However, the representative services doctrine will apply to allow a finding of general jurisdiction, when a closely related and supervised company conducts local activities that are not independent from, but are performed solely as an arm of and to assist, its senior, international/parent company in its business. (*Paneno v. Centres for Academic Programmes Abroad Ltd.* (2004) 118 Cal.App.4th 1447, 1451–1452, 1456–1457 [13 Cal.Rptr.3d 759] (*Paneno*).) In such a case, the parent company is not considered to be just a holding company that may escape a general jurisdiction finding based on its directed California activities.

B. *Application*

Under these rules, we must determine from the record whether plaintiffs carried their burden of showing that Aquila's control over AMS was such as to demonstrate a parental "purposeful disregard of the local entity's separate corporate existence. [Citations.]" (*Automobile Antitrust, supra,* 135 Cal.App.4th at p. 120.) Not only agency must be shown, but also a lack of separateness in the purposes and functions of the two companies. Plaintiffs rely strongly upon Aquila's president's statements in 2002 press releases about the need to rebrand UtiliCorp (to Aquila), and the former Aquila (to

AMS), to build the brand with Aquila's name for marketing purposes. Plaintiffs suggest that this was a confusing use of the same generic trade name on which plaintiffs relied. Plaintiffs point out that Aquila identifies its core strategy as being a multinational energy solutions provider in the markets in which it competes, on three continents, and that it has three major groups (networks of regulated electric and gas operations; energy merchants such as AMS which trade and market wholesale commodities; and other services). Plaintiffs therefore infer that AMS must be performing services in California that Aquila would otherwise perform itself.

Aquila's general counsel filed a supplemental declaration stating, "Due to regulatory, financial, and practical concerns, Aquila has never engaged in merchant wholesale gas trading operations in California, nor would it have engaged in such operations if its subsidiary AMS did not exist." Aquila is a regulated public utility and AMS is an energy merchant trader. Although plaintiffs attempted to show that Aquila and its subsidiaries were one and the same, Aquila rebutted that showing through its declarations and explanations of the exhibits.

Under the case authority outlined above, Aquila's purchase of an insurance policy for the parent and subsidiary companies does not establish the pervasive control required for the representative services doctrine to apply. (*Dorel, supra,* 134 Cal.App.4th at p. 1276.) Also, Aquila's consolidated financial reporting, such as the SEC Forms 10-K, does not demonstrate the necessary pervasive control for an agency finding. (*F. Hoffman-La Roche, supra,* 130 Cal.App.4th 782, 801.) The guarantee Aquila provided for the AMS financial obligations under the SMUD contract does not destroy the separateness of the parent and subsidiary companies under *Sonora Diamond, supra,* 83 Cal.App.4th at pages 547–548.

Applying these criteria to this record, we cannot conclude that plaintiffs carried their burden of showing that the necessary substantial contacts for general jurisdiction existed here, such that the representative services doctrine could apply. Aquila adequately rebutted any claims by plaintiffs that its subsidiary companies conducted activities here that were limited to assisting the parent company in its own business. (*Paneno, supra,* 118 Cal.App.4th 1447, 1451–1452, 1456–1457; *Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.) As outlined above, the items of judicial notice submitted by plaintiffs required interpretation and were not admissible for the truth of their contents. The trial court should have granted the motion to quash service of summons.

## DISPOSITION

Let a peremptory writ of mandate issue requiring the trial court to vacate its order denying the motion of Aquila to quash service of summons and to enter a new order granting the motion. Petitioner is awarded its costs incurred in this original proceeding.

McConnell, P. J., and Benke, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied July 11, 2007, S152043.