Filed 4/27/16  Dahan v. JPMorgan Chase Bank CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| JEROME DAHAN, | B260329 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC482099) |
| v. | |
| JPMORGAN CHASE BANK, N.A. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael L. Stern, Judge.  Affirmed.

Law Offices of Gary Freedman and Gary Freedman; Brown George Ross, Peter W. Ross, Ira Bibbero and Christian K. Wrede for Plaintiff and Appellant.

Greenberg Traurig, Scott D. Bertzyk, Karin L. Bohmholdt and Nicholas A. Insogna for Defendants and Respondents.

_____

Jerome Dahan sued JPMorgan Chase Bank, N.A., J.P. Morgan Securities, LLC, Dale Reed, and Scott Keifer (collectively, JPMorgan) in connection with JPMorgan's management of his brokerage accounts. A jury found in favor of JPMorgan and Dahan contends various errors warrant reversal of the judgment. We affirm the judgment.

## FACTS

Dahan is a designer of premium jeans. He amassed a $140 million fortune primarily by selling his ownership interest in two companies – 7 for all mankind and Citizens for Humanity. Dahan enlisted the help of Gary Freedman, his attorney and business partner, to manage his money. Upon Freedman's suggestion, Dahan chose JPMorgan to manage his investments in 2005. Dahan's primary goal was to protect his principal and he was not concerned with taking risks with his money to earn a higher return. To that end, he opened two types of accounts at JPMorgan, a brokerage account, for which he made the investment decisions, and a managed account, for which JPMorgan made the investment decisions. Dahan and Freedman directed JPMorgan to hold a small amount of cash in the managed account, but place the bulk of it in shorter term bonds. The managed account was initially handled by James Walker at JPMorgan. Sometime afterwards, Dahan, along with Freedman, agreed to move the funds to longer term bonds with an average duration of seven years to get a higher interest rate.

Dahan sued JPMorgan on April 3, 2012, after he became unhappy with how JPMorgan handled his managed account. In the operative second amended complaint, Dahan sought damages for fraud, breach of fiduciary duty, negligence and breach of contract. Dahan alleged JPMorgan exceeded the mandate he gave them by purchasing seven bonds for the managed account with extended maturation dates and variable rates, which resulted in an approximate $2 million loss when they were sold in 2012. Dahan also alleged JPMorgan engaged in self-dealing by purchasing bonds from its own inventory or which it underwrote. This conduct, he alleges, was contrary to assurances made to Dahan and Freedman that JPMorgan would only make money from the administrative fees levied on his account and that JPMorgan entities would not be on both

2

sides of any transactions. According to Dahan, this self-dealing created a conflict of interest which resulted in a breach of contract and fiduciary duty. At trial, Dahan presented testimony from Ben Konner, who became the Global Investment Specialist on his managed account in 2008. Konner testified he believed it was "not okay" to buy bonds for a client's managed account out of JPMorgan's inventory.

Dahan admitted at trial he did not read any of the account documents he signed and only reviewed the statements sent by JPMorgan once every six months, but did not understand them. He also did not recall in any detail his meetings or conversations with JPMorgan representatives. Instead, he relied on Freedman to advise him.

Freedman testified at length about his contacts with JPMorgan. Freedman participated in an initial conference call with Lynn Barbara, Walker, Keifer and Nancy Shepherd on January 31, 2005, to discuss investing approximately $30 million Dahan had realized from the sale of 7 for All Mankind. Dahan did not participate in this call. JPMorgan advised Freedman what it would charge to hold the account, depending on how much of the $30 million Dahan chose to invest with them. Walker also recommended purchasing shorter-term bonds due to the state of the bond market at the time. Several months later, Dahan, Freedman, and Tony Millar, the Chief Financial Officer of Citizens of Humanity, met with Keifer and Reed. Reed told Dahan, Millar and Freedman he would manage the relationship and oversee the various investments, loans, and other accounts Dahan had with JPMorgan.

Towards the end of 2005, Freedman notified Reed and Keifer that Dahan anticipated receiving $100 million from the sale of part of Citizens of Humanity. Freedman believed they were "anxious to present to Jerome alternative investment ideas where they could make more money than the fee that they were earning from just simply managing a fixed income account." Dahan, however, decided he did not want to take any risks with his money and decided to keep it in either cash or fixed income securities with a definite cash flow. That meant JPMorgan would purchase bonds with an average maturity of seven years. Dahan's investment goals were set forth in a document called

3

the Discretionary Portfolio Mandate. The mandate identified the goal of the account to be capital preservation and the risk profile to be conservative. Freedman testified he and Dahan were happy with how JPMorgan was handling Dahan's money in 2005 and 2006. As a result, they decided to allow JPMorgan to manage all of Dahan's money, believing that Dahan would be a "really important client" by having all of his money in one place. The proceeds from the sale of Citizens of Humanity were eventually deposited with JPMorgan in January 2006.

In 2007, JPMorgan purchased seven bonds with extended maturity dates and variable interest rates. These are the bonds at issue in the litigation. Two of the bonds were purchased from an inventory of saleable securities held by J.P. Morgan Securities and it received payment in connection with each of these two purchases. The other five bonds were purchased from a public offering for which J.P. Morgan Securities served as the underwriter and received an underwriting fee. On April 30, 2009, Dahan and Freedman were informed that Walker was leaving JPMorgan.

In October 2011, Freedman and Dahan met with a private banking team from Wells Fargo to discuss possibly allowing Wells Fargo to manage $15 million of Dahan's money. At this meeting, Wells Fargo identified the seven bonds which did not fall within the parameters of Dahan's conservative investment goals. In particular, the bonds had variable interest rates and the maturity dates were very far in the future, which appeared inconsistent with Dahan's requirement that the bonds mature in one to seven years with fixed amounts paid on each coupon date.

When Dahan terminated his relationship with JPMorgan at the end of 2011, he again sought Freedman's advice about what to do with his assets. Freedman suggested he try Bessemer Trust. After the assets were transferred, Freedman advised Bessemer Trust to use its discretion in deciding which bonds to sell and which to keep. Bessemer sold the seven bonds at issue at a loss of approximately $1.7 million.

4

At trial, Freedman admitted he did not review the agreements between Dahan and JPMorgan when the initial accounts were opened in 2005. Freedman also admitted he received documents from JPMorgan showing the disputed bonds were in Dahan's account, but did not notice the bonds' duration and did not ask any questions about them. He recalled Goldman Sachs, in a 2009 sales pitch, attempting to draw his attention to the disputed bonds, but he failed to understand their significance at the time. Dahan also presented testimony from adverse witnesses employed by JPMorgan, who acknowledged Dahan was owed fiduciary duties in connection with his account.

JPMorgan's defense centered on Dahan's admissions at trial that JPMorgan fulfilled his objectives by protecting his principal and making him $20 million in profit on top of that. According to JPMorgan, its investment strategy fulfilled Dahan's capital preservation goal because it diversified his bond portfolio to take into account interest rate fluctuations. JPMorgan also highlighted the discretion Dahan granted them to manage his account. JPMorgan admitted into evidence Dahan's account documents, which contained various disclosures regarding JPMorgan's discretion and duties to Dahan. In the account application, Dahan agreed to review and immediately notify JPMorgan of any issues. He also agreed to read the General Terms for Accounts and Services (General Terms) and that the General Terms comprised a part of the agreement between the parties.

Under the General Terms, a client authorized JPMorgan "to act on my behalf even though you or any Morgan Affiliate may have a potential conflict of duty or interest in a transaction. This includes the fact that you or any Morgan Affiliate may: . . . as underwriter, broker, dealer or placement agent with respect to securities; . . . earn fees and profits from any of the above-listed activities . . . The foregoing roles, interests and separate compensation may be applicable to privately placed investments as well as other securities or instruments. [¶] . . . [¶] You are authorized to arrange for the execution of transactions . . . by means of brokers or other financial organizations of your choosing, including Morgan Affiliates. In addition, when you buy or sell securities or other

5

property for which you or another Morgan Affiliate acts as a dealer or underwriter, you may buy or sell as principal . . . from or to either yourself or such other Morgan Affiliates, or from or to a member of an underwriting syndicate of which you or a Morgan Affiliate is a member."

The General Terms further disclosed that as to municipal bonds, JPMorgan "or Morgan Affiliates may hold a position or act as market maker in the financial instruments of any issue I may invest in, or act as underwriter, placement agent, advisor, or lender to an issuer." In his closing remarks, JPMorgan's trial counsel emphasized Dahan's admission that he did not care whether a bond was underwritten by JPMorgan if it was "a good bond" and that he did not have a problem with purchasing long term bonds.

JPMorgan moved for summary judgment on July 19, 2015, on the grounds it had a complete defense to Dahan's causes of action and there was no triable issue of material fact to support his claims for punitive damages. The trial court granted summary adjudication on the punitive damages issue, finding there was no clear and convincing evidence of malice, oppression or fraud to support punitive damages. On all other grounds, the trial court found triable issues of material fact.

Additionally, the trial court granted JPMorgan's motion for nonsuit on the fraud cause of action at the conclusion of Dahan's case in chief. As a result, the jury was asked to decide facts relating only to Dahan's breach of contract and breach of fiduciary claims.[1] The jury returned a special verdict for JPMorgan, finding, among other things, that neither JPMorgan Chase Bank, N.A. nor J.P. Morgan Securities, LLC did anything that the contract prohibited them from doing. The jury also found each of the defendants owed Dahan a fiduciary duty, but that Dahan did not prove any of the defendants breached his or its duty of loyalty. Judgment was entered October 2, 2014, and Dahan timely filed his notice of appeal on November 25, 2014.

---

[1] Dahan dismissed his negligence claim before trial.

6

Dahan takes issue with several of the trial court's rulings in this case, contending each warrants reversal of the judgment. Chief among them is the trial court's refusal to judicially notice a brochure issued by a JPMorgan affiliate – J.P. Morgan Investment Management Inc. (JPMIM). Dahan asserts this brochure was a "smoking gun" that would have allowed the jury to find in his favor because it contained admissions by JPMorgan about its fiduciary duties to its clients. Dahan also contends the trial court erred when it refused to instruct the jury on informed consent or waiver and when it issued its rulings on summary adjudication and nonsuit. We address each of these issues in turn and find none of them warrant reversal.

## I.      Judicial Notice of Form ADV Part 2A

Dahan contends the trial court erred when it denied his request to judicially notice a "smoking gun" document which "contained damning admissions against interest" by JPMorgan. According to Dahan, the document, Form ADV Part 2A, described JPMorgan's own standards with respect to its fiduciary duties and disclosure obligations in connection with self-dealing. Dahan contends it showed JPMorgan acted outside of its own standards.

### A.  Proceedings Below

Dahan's attorney found and printed Form ADV Part 2A from the Securities and Exchange Commission (SEC) website. Form ADV Part 2A is a brochure issued by JPMIM and is dated October 18, 2013. JPMIM is not a party to this action.[2] In it, JPMIM describes the advisory services it provides to its clients, including "discretionary and non-discretionary investment management services and products to institutional

---

[2]      Reed testified it was his understanding JPMIM was the business unit that actually made the decisions about buying specific bonds for Dahan's account and was obligated to JPMorgan Chase Bank to comply with Dahan's investment objectives. Benn Konner, a managing director at JPMorgan Chase Bank, testified JPMIM provided investment management services to Dahan's account.

clients and individual investors.  In performing investment advisory services for its clients, JPMIM acts as a fiduciary."  These fiduciary duties include:

"Obligations to disclose to you all material conflicts between our interests and your interests.

"If we or our affiliates receive additional compensation from you or a third-party as a result of our relationship with you, we must disclose that to you.

"We must obtain your informed consent before engaging in transactions with you for our own account or that of an affiliate or another client when we act in an advisory capacity."

Form ADV Part 2A further stated JPMIM's Code of Ethics required it to "avoid any actual or potential conflict of interest."  It further stated JPMIM was "guided by fiduciary principles in the management of conflicts of interest."

Dahan filed a request to take judicial notice of the form on the grounds it was a document filed with the SEC and under Evidence Code section 452, subdivision (h). Both requests were denied.  Dahan sought to admit it several more times during trial, but was denied each time.  However, he was permitted to ask JPMorgan witnesses if they knew of or had seen the document before.  The trial court ruled he would only then be allowed to question them on the contents of Form ADV Part 2A once this foundation was laid.  None of the JPMorgan witnesses testified they had seen or knew about the document.  As a result, Dahan was unable to admit the document into evidence.

### B. Legal Standard

The purpose of judicial notice is to expedite the production and introduction of otherwise admissible evidence.  (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578.)  Evidence Code section 451 sets forth the matters that a trial court is required to judicially notice, including "[f]acts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute."  (Evid. Code, § 451, subd. (f).)  Evidence Code section 452 sets forth the matters a trial court has discretion to judicially notice, including "[f]acts and propositions that are not reasonably

8

subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).)

In either case, the matter to be judicially noticed must be relevant, and is subject to the rules of privilege and the qualifications under Evidence Code section 352. (Evid. Code, § 454, subd. (a)(2).) Section 352 permits the exclusion of otherwise relevant evidence if the trial court determines its probative value is substantially outweighed by the probability of undue consumption of time, or prejudice or confusion. We review the trial court's denial of Dahan's request for judicial notice for an abuse of discretion. (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 753-754.)

## C. Analysis

Dahan contends Form ADV Part 2A was relevant because it included "admissions involving J.P. Morgan's representations as to how . . . Mr. Dahan's account would be managed; J.P. Morgan's subjective understanding of how Mr. Dahan's account should be managed; the characteristics of conflicts of interest; and J.P. Morgan's obligations with respect to disclosures and informed consent where conflicts of interest arose." According to Dahan, "J.P. Morgan's Form ADV Part 2A was not just relevant; it was the 'smoking gun' in this case because it directly contradicted Defendants' characterization of their fiduciary duties and disclosure obligations in connection with self-dealing and show[ed] that Defendants failed to comply with J.P. Morgan's own published standards with respect to the management of investment accounts."

We fail to see how Form ADV Part 2A, issued by JPMIM in 2013, is relevant to Dahan's claims against JPMorgan for transactions occurring in 2007. Contrary to Dahan's contention, Form ADV Part 2A did not contain any representations to Dahan as to how his account would be managed. The brochure could not have been given to him since it is dated one year after he terminated his relationship with JPMorgan. Even if we agree that JPMIM's statements in Form ADV Part 2A can be attributed to the JPMorgan entities Dahan sued (JPMorgan Chase Bank and J.P. Morgan Securities), we do not see how JPMorgan can be retroactively held to these statements.

9

The Supreme Court's analysis in *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057 (*Mangini*), overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276, is instructive. In *Mangini*, the court refused to take judicial notice of a letter from a number of state attorneys general and a newspaper account of that letter. (*Mangini, supra,* 7 Cal.4th at p. 1065.) The court reasoned, "[a] letter by persons seeking repeal of a statute, written long after its enactment, is irrelevant to the interpretation of that statute. Moreover, the existence of the newspaper article is irrelevant, and the truth of its contents is not judicially noticeable." (*Id.* at p. 1064.) Dahan likewise urges us to take judicial notice of irrelevant statements in a form filed with a government body "long after" the disputed transactions occurred. The trial court did not abuse its discretion in refusing to take judicial notice of Form ADV 2A.

In any case, the trial court admitted a similar document entitled, "J.P. Morgan Asset Management Conflicts of Interest Policy." This policy document identified a conflict of interest "if we are providing a service and, beyond that, we or another member of our JPMC Group (an 'Affiliate') may have a material interest, relationship or arrangement in the transaction or product or service[.]" In situations where there is a conflict, the document identified certain practices and procedures to "avoid material risk of damage to your interests" including disclosure, information barriers, separation of functions and declining to act. Dahan was permitted to question witnesses about the statements in this document as well as their understanding of their fiduciary and disclosure obligations to clients. In addition, the jury was adequately instructed on the elements of a breach of fiduciary claim and the obligations of a fiduciary. Accordingly, any error resulting from the refusal to judicially notice Form ADV 2A was harmless. (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 569.)

## II.    Instructional Error

At trial, Dahan requested two jury instructions involving informed consent and waiver, which were rejected by the trial court. Dahan contends on appeal, "it cannot be denied that the jury would have been more likely to reject Defendants' exculpatory view

10

of the General Terms Document and scrutinize J.P. Morgan's duties, conflicts and disclosures more closely – and, therefore, 'might have drawn different inferences more favorable' to Mr. Dahan – had proper instruction as to waiver, informed consent or both been provided." We are not persuaded.

It is well established that a party is entitled upon request to correct nonargumentative instructions on every theory of his case which is supported by substantial evidence. (*Rosenfeld v. Abraham Joshua Heschel Day School Inc.* (2014) 226 Cal.App.4th 886, 898.) However, "[a] party is not entitled to have the jury instructed in a particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.) "Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.) Finally, "[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. [Citations.]'" (*Id.* at p. 719; see *Hyatt v. Sierra Boat Co.*, *supra*, 79 Cal.App.3d 325, 335.)

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) "Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate

11

(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id*. at pp. 580-581, fn. omitted.) "The propriety of jury instructions is a question of law that we review de novo. [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

## A. Informed Consent

At trial, Dahan sought to advise the jury "'[i]nformed consent' requires the fiduciaries to disclose to their client or his representatives all material facts that they know, have reason to know, or should know would reasonably affect their client or his representatives' judgment, unless the client has manifested that such facts are already known by him or that he does not wish to know them."[3] The proferred instruction was part of an instruction describing fiduciary duties in general. It supported Dahan's theory at trial that JPMorgan was required to seek consent from Dahan before the transactions took place.

The trial court refused the instruction, and instead gave the standardized CACI instructions on fiduciary duties: "An investment advisor owes what is known as a fiduciary duty to its client . . . [¶] . . . Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept

---

[3]     The instruction quotes from section 8.06(1)(a)(ii) of the Restatement Third of Agency, which describes the duties incumbent on an agent in obtaining the principal's consent. JPMorgan suggests Dahan's trial counsel withdrew his request for this special instruction during his discussion with the trial court about the verdict form and jury instructions by stating: "I believe we composed a special instruction . . . But we're happy to accept the Wolf language." It is unclear from the portion of the record cited, however, whether the "special instruction" referenced by Dahan's trial counsel specifically referred to the informed consent instruction at issue here or to a different portion of the jury instructions relating to fiduciary duties. Dahan fails to address this point in his briefing. We decline to rely on this brief and vague declaration  to find the instruction was withdrawn.

12

the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent."[4]

The trial court further instructed the jury on the elements to a breach of fiduciary duty claim found in CACI 402, stating in pertinent part Dahan had to prove:

"2. That [JPMorgan] knowingly acted against Jerome Dahan's interests and either (1) acquired a material benefit in connection with transactions conducted by [JPMorgan] on behalf of Jerome Dahan; or (2) engaged or caused J.P. Morgan Securities, LLC s to engage in transactions with Jerome Dahan's managed account without providing full disclosure to Jerome Dahan or his agent about the transactions;

"3. That Jerome Dahan or his agent did not give informed consent to the conduct of [JPMorgan]."

We find these instructions satisfactorily presented Dahan's theory of the case to the jury.

Nevertheless, Dahan contends the general instructions given by the trial court "did nothing to 'instruct in specific terms' as to the type of disclosure and conduct required for informed consent." The California Supreme Court in *Soule* is instructive on this issue. There, the plaintiff was injured in a car accident. (*Soule, supra,* 8 Cal.4th at p. 557.) She sued General Motors (GM), alleging she suffered enhanced injuries to her ankles as a result of defects in the car's design. GM denied any design defect and argued the plaintiff's injuries were a result of the force of the collision. At trial, GM attempted to show that the plaintiff was not wearing her seatbelt and had locked her legs in reaction to the imminent collision, which caused her ankles to absorb the force of her forward movement. (*Ibid.*)

The plaintiff prevailed at trial and GM appealed partly on the ground the trial court erroneously denied GM's request for the following special instruction on causation: "'If you find that the subject Camaro . . . was improperly designed, but you also find that

---

**4**      The instruction was based partly on CACI 4100 and on language found in *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29.

[plaintiff] would have received enhanced injuries even if the design had been proper, then you must find that the design was not a substantial factor in bringing about her injuries and therefore was not a contributing cause thereto.'" (*Soule, supra,* 8 Cal.4th at p. 559.) The high court affirmed the judgment on the ground that any error was harmless. (*Id.* at p. 557.)

In reaching its decision, the *Soule* court found the proposed instruction to be a correct statement of the law and supported by substantial evidence. (*Soule, supra,* 8 Cal.4th at p. 572.) However, it found the trial court's refusal to give the instruction was not prejudicial. The trial court instructed the jury that the plaintiff could not recover for a design defect unless the defect was a "substantial" factor in producing her enhanced injuries. The trial court's general instructions "thus encompassed GM's causation theory, and they did not foreclose a defense verdict on that theory. [¶] What GM failed to obtain was a further explanation of how general principles of causation related to GM's specific claim that Plaintiff's ankle injuries were caused by the force of the accident, not by any design defect in the Camaro. In essence, the omitted language was thus similar in function and purpose to 'pinpoint' instructions. It is well settled that the erroneous refusal of 'pinpoint' instructions may be deemed harmless in appropriate cases." (*Id.* at p. 581.) The plaintiff and GM both devoted substantial attention to the causation issue during trial and "[t]hus, the evidence and argument uniformly supported the reasonable inference that the general causation instruction allowed GM to escape liability if plaintiff's injuries would have occurred regardless of any defect." (*Id.* at p. 582.)

We find the court's analysis in *Soule* to apply just as well here. The state of the evidence, the other instructions, and counsel's arguments support the conclusion that Dahan was not prejudiced by the omission of this instruction. Indeed, there is no indication the jury was misled. (*Soule, supra,* 8 Cal.4th at p. 582.)

First, there was not an entire absence of instructional support for Dahan's theory of consent. The trial court's instructions on fiduciary duty included reference to the need for "full disclosure" and "informed consent." These instructions encompassed his theory of liability and they did not foreclose a plaintiff's verdict on that theory.

Second, Dahan ensured the jury was informed his claims were based on the allegations that JPMorgan failed to fully disclose its conflicts and failed to obtain informed consent from him for the transactions. He presented extensive evidence and argument about this at trial. Both parties devoted considerable time to presenting testimony and evidence on consent. Freedman testified neither he nor Dahan were ever provided materials about specific bonds for their approval. Nor did JPMorgan ever tell them they were earning fees or making a profit in connection with any particular transaction in the managed account. JPMorgan, on the other hand, relied upon the General Terms document, which it argued disclosed to Dahan JPMorgan's trading practices and potential conflicts of duty. By signing the account opening documents, which incorporated the General Terms, JPMorgan believed Dahan essentially provided informed consent to its subsequent transactions.

At closing, both parties vehemently disagreed on what was necessary to acquire informed consent. JPMorgan's counsel argued JPMorgan provided full disclosure and Dahan provided informed consent "up front" through the General Terms. Dahan's trial counsel argued, "[a]ll they had to do was tell Mr. Dahan and Mr. Freedman about the bonds, including the fact that their affiliate was underwriting them and buying them at a discount and selling them at a higher price, and get Mr. Dahan and Mr. Freedman's express consent. [¶] That's what a fiduciary duty requires, and that's what the defendants didn't do." Plaintiff's counsel also informed the jury that the verdict form specifically asked whether Dahan gave informed consent and instructed them to answer, "no." He emphasized, "You heard the defendants say we don't have to give him consent. The law says otherwise."

15

Thus, the evidence and argument supported the reasonable inference that the general consent instruction allowed Dahan to fully present his case to the jury. The record supports the conclusion the jury was well aware it was tasked with deciding, among other things, whether Dahan provided informed consent. Thus, it is not reasonably probable that the omission of this pinpoint instruction prejudicially affected the verdict. Dahan's contentions that he was harmed by the omission are baseless.

### B. Waiver Instruction

Dahan next contends a proposed waiver instruction should have been given to the jury. It provided: "In determining whether [JPMorgan] breached the fiduciary duties they owed to Jerome Dahan, you must disregard any term or provision of any contract or writing between Jerome Dahan and [JPMorgan] that attempts, either directly or indirectly, to exempt [JPMorgan] from responsibility for their breach of fiduciary duty." Dahan contends this instruction was "a correct statement of applicable law in light of the fact that the General Terms Document plainly did not supply the specific disclosures required for informed consent [citation], and the fact that the settled law of California flatly prohibits generalized waivers for fiduciary duties." The instruction was necessary, Dahan contends, because "Defendants essentially contend that they were 'immunize[d]' from liability for breaches of fiduciary duty" by the General Terms. We disagree.

First, JPMorgan did not contend it was immunized from liability by a waiver. It acknowledged it had a fiduciary duty to Dahan. Indeed, the jury was instructed as to its fiduciary duties. JPMorgan instead argued its fiduciary duties were fulfilled by the disclosures contained in the General Terms about potential conflicts of interest.

These disclosures do not purport to relieve JPMorgan of its fiduciary duties in the same way the exculpatory clauses did in the cases relied upon by Dahan, *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 (*Cohen*) and *Neubauer v. Goldfarb* (2003) 108 Cal.App.4th 47 (*Neubauer*). In *Cohen,* a homeowners association sought to be absolved from any affirmative duty to enforce its own covenents, conditions, and restrictions through several exculpatory clauses. One such clause stated,

16

"'The [Association] shall not be required to comply with any of the provisions of this Section 1.'" Another provided, "'To the fullest extent permitted by law, neither the Board, any committees of the Association nor any member shall be liable to any Member or Owner or the Association for any damage, loss or prejudice suffered or claimed on account of any decision, approval or disapproval of plans or specifications (whether or not defective), course of action, act, omission, error, negligence or the like made in good faith within which such Board, committee, or persons reasonably believed to be the scope of their duties.'" (*Cohen, supra,* 142 Cal.App.3d at p. 650.)

Likewise in *Neubauer,* a waiver and release provision in a sales contract stated: "'Seller acknowledges that neither HCC nor its officers, directors or controlling shareholders have any fiduciary duty to seller or HCC in connection with the execution of this agreement or a sale including, but not limited to, the fairness of the overall consideration or the allocation thereof.'" The agreement further acknowledged "'[s]eller . . . has requested and received such information in connection with the execution of this agreement as he believes to be necessary in order to make an informed decision to enter into this agreement and to bind himself as set forth herein' and '[t]he provisions hereof have been thoroughly reviewed by all parties and have been the subject of negotiations.'" (*Neubauer, supra,* 108 Cal.App.4th at p. 55.)

The provisions in *Neubauer* and *Cohen* are patently different from the contested disclosures in the General Terms, which authorized JPMorgan "to act on [Dahan's] behalf even though you or any Morgan Affiliate may have a potential conflict of duty or interest in a transaction. This includes the fact that your or any Morgan Affiliate may . . . act as underwriter, broker, dealer or placement agent with respect to securities . . . earn fees and profits from any of the above-listed activities in addition to the fees charged to me for your services under this Agreement . . . "

Thus, California's prohibition against waivers of fiduciary duty did not apply in this case. (Civil Code section1668 ["All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the

17

person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."].) The proposed instruction was properly denied because it was simply inapplicable to the facts of the case.

## III. Nonsuit as to the Fraud Cause of Action

JPMorgan orally moved for nonsuit on all causes of action at the close of Dahan's case in chief. It argued, in relevant part, that nonsuit was appropriate on Dahan's fraud cause of action because there was no reasonable reliance. Specifically, any oral representations about conflicts made to Freedman or Dahan were contradicted by the General Terms, which Dahan acknowledged was incorporated into the account opening documents he signed. Dahan disputed JPMorgan's characterization of the facts; Freedman testified he did not see the General Terms until the litigation and Dahan said he did not remember seeing the General Terms.

The trial court granted the motion as to the fraud cause of action, reasoning, "The fraud cause of action requires false representations, concealment or nondisclosure. These are classic – it's a classic case of the elements fitting or not. [¶] And we frequently see fraud causes of action that have the depth of evidence that would allow the case to go to the jury. I don't see it here. I don't see the false representations as based on the evidence. I don't see the knowledge of false – you know, scienter . . . [¶] Most importantly, there's no intent demonstrated to defraud. Its business transactions in which the defendants had fiduciary – they concede they had a fiduciary duty to properly represent the interests of Mr. Dahan. There's no intent shown here. There's no induced reliance, which takes you to justifiable reliance . . . " Dahan contends the trial court improperly credited the General Terms and discredited evidence contradicting its applicability. In particular, testimony at trial demonstrated Dahan never signed the General Terms and was unaware of the document. Once again, we are not persuaded.

A defendant may move for nonsuit after the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury. (Code Civ. Proc., § 581c, subd. (a).) "In determining whether a nonsuit was properly

18

granted the reviewing court must resolve every conflict in testimony in favor of the plaintiff and at the same time indulge in every presumption and inference which could reasonably support the plaintiff's case. [Citation.] The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper. [Citation.]" (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)

In *Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578, the court affirmed a grant of nonsuit against plaintiff insureds. In *Hadland,* the insurance agent assured the plaintiffs the policy they purchased from him would be better than the one they had. In reality, however, the policy provided lower benefits, such as a lower maximum surgical benefit and lower maximum outpatient hospital charges. (*Id.* at pp. 1586-1589.) Any representations made by the agent were patently at odds with the express provisions of the written contract. Thus, the plaintiffs' reliance on oral representations was unjustified as a matter of law. (*Id.* at p. 1589.) Dahan's reliance on any oral representations was likewise unjustified. Whether he recalled reading or receiving the General Terms does not negate the fact he signed account opening documents which expressly incorporated the General Terms and discretionary portfolio mandates which confirmed the General Terms were part of his contract. (*See Chan v. Drexel Burnham Lambert Inc.* (1986) 178 Cal.App.3d 632, 641.) In short, Dahan simply failed to fulfill his burden of establishing reasonable reliance.

IV.    **Summary Adjudication on Punitive Damages**

Dahan next contends the trial court's order granting summary adjudication as to punitive damages should be reversed because it applied an incorrect standard in deciding the motion and there was sufficient evidence in opposition for a reasonable jury applying the clear and convincing standard to find for Dahan on the issue. Dahan contends the

19

trial court's finding as to the punitive damages issue was inherently contradictory because it also found a triable issue regarding whether JPMorgan defrauded him. Our decision to affirm the jury's verdict renders this issue moot and we need not address it. (*See Cacho v. Boudreau* (2007) 40 Cal.4th 341, 345.)

## DISPOSITION

The judgment is affirmed. JPMorgan to recover its costs on appeal.

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.

20